UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MULTIMEDIA PLUS, INC., et al.,<br><br>          Plaintiffs,<br><br>     v.<br><br>PLAYERLYNC, LLC,<br><br>          Defendant. | Case No.:  14-8216 (WHP)<br><br>**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Date:         November 6, 2015<br>Time:        11:00 a.m.<br>Courtroom: 20B<br>Judge:       Hon. William H. Pauley III |

**TABLE OF CONTENTS**

I.   Introduction ........................................................................................................................1

II.  The '025 Patent Is Directed to an Abstract Idea ................................................................2

III. Plaintiff has not shown an "inventive concept" beyond the abstract idea of administering tests ...............................................................................................................7

    A.   "low-bandwidth" ..........................................................................................................8

    B.   "enables a manager to review the employee data as it comes in" ...............................8

IV.  The Prosecution History Does Not Support Patent Eligibility .........................................9

V.   Alleged Evidence of Copying Is Irrelevant to the Eligibility Analysis ...........................10

VI.  Conclusion .......................................................................................................................10

# TABLE OF AUTHORITIES

**Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2356 (2014) ................................. passim

*IPLearn v. K12 Inc.*, 76 F.Supp.3d. 525, 533 (D. Del. 2014) .................................................. passim

*Microsostrategy Inc. v. Apttus Corp.*, Case No. 3:15-cv-00021,
   2015 WL 4448019 (E.D. VA. July 20, 2015) ........................................................................ 9

*Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014) .............................. 1, 2, 6, 8

**Statutes**

35 U.S.C. § 101 ................................................................................................................. 2, 7, 9, 10

35 U.S.C. § 102 ................................................................................................................................ 2

35 U.S.C. § 103 ........................................................................................................................ 2, 10

## I. Introduction

The '025 Patent embodies nothing more than the abstract idea of instructing, evaluating, and reviewing test results of students or trainees, and therefore is not patentable. *See IPLearn v. K12 Inc.,* 76 F. Supp. 3d. 525, 533 (D. Del. 2014). When the generic computing equipment is removed, the so-called "learning management system" of the '025 Patent is no different than the learning systems employed by teachers in the nation's nearly one-hundred thousand public schools for centuries. The claims recite a method and system for managing learning by:

(a) "presenting a . . . training program including a test having questions";

(b) "enabling an employee to take the test and enter answers to the questions";

(c) "a central location . . . to receive . . . test information";

(d) "transmitting . . . only the employee identifier and . . . test information"; and

(e) "enabling a manager to access the . . . test information."

*See, e.g.*, Motion for Judgment for Judgment on the Pleadings (Mot.), Ex. 1, Doc 48-1, 9:57-10:10. The generic computer and networking terms sprinkled throughout the claims—"computer server," "local computer," and "low-bandwidth connection"—were entirely conventional, routine, and well-known at the time of filing. *See Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2356 (2014). None of them make the claims less abstract. *Id.* Rather, the '025 Patent preempts the abstract idea of administering tests by applying that centuries' old practice using conventional computers. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014).

Plaintiff's opposition fails to point to anything in the '025 Patent that demonstrates an "inventive concept to transform the claimed abstract idea into patent-eligible subject matter." *See Ultramercial,* 772 F.3d at 715. Plaintiff suggests the use of a "low-bandwidth connection" is a "useful, novel and nonobvious solution." Plaintiff's Memorandum of Law in Opposition to Defendant's for Judgment on the Pleadings ("Opp."), p. 5. The specification, however, makes

clear that the "low-bandwidth connection" was entirely conventional, routine, and well-known. Mot., Ex. 1, 5:38-46 (describing the low-bandwidth connection as "any type of communication link . . . a *conventional* Internet connection"). Plaintiff admits that the addition of the "low-bandwidth connection" to the claims has "no relevance to the instant [eligibility] inquiry." *See* Opp., p. 11 (referring to "an intervening prior art rejection" where the patentee responded by adding the "low-bandwidth connection" language"). And "the use of the Internet is not sufficient to save otherwise abstract claims from ineligibility under § 101." *See e.g. Ultramercial,* 772 F.3d at 716. So Plaintiff's reliance on the admittedly conventional "low-bandwidth connection" does not make the abstract idea of administering a patentable.

Plaintiff also resorts to legally irrelevant facts, and confuses the § 101 analysis with unrelated concepts from §§ 102 and 103. For example, Plaintiff argues without authority that the claims of the '025 Patent are somehow eligible for protection because they "clearly recite significant structure well beyond the allegedly abstract idea." Opp., p. 1. As the Supreme Court articulated in *Alice*, whether a claim contains structural components or method steps does not change the § 101 analysis. *See Alice*, 134 S. Ct. at 2360. Plaintiff also contends that PlayerLync somehow "copied" the '025 Patent because PlayerLync personnel visited Plaintiff's public website. Putting aside that visits to a public website do not show copying of a patent, coping evidence, while relevant to obviousness under 35 U.S.C. § 103, is irrelevant to the eligibility analysis under § 101. *See e.g. IPLearn LLC*, 76 F. Supp. 3d at 534 ("A new idea, *i.e.*, one that is not anticipated [under 35 U.S.C. § 102] and non-obvious [under 35 U.S.C. § 103], does not, however, make an abstract idea patent eligible."). Accordingly, the Court should find the '025 Patent invalid, as many other courts have in other similar cases since *Alice*.

II.   **The '025 Patent Is Directed to an Abstract Idea**

As explained in PlayerLync's opening brief, the '025 Patent is directed to the abstract

idea of administering a test – providing instructional materials, evaluating comprehension of the materials through test questions, and reviewing the test results.  This activity falls squarely within the categories that *Alice* holds are abstract.  *See Alice,* 134 S.Ct. at 2355-57 (articulating various ineligible abstract ideas such as a "fundamental practice . . . long prevalent in our system," and a "method of organizing human activity").  Providing training materials, testing, and reviewing answers, is a fundamental practice that has been the cornerstone of education and training for centuries.  It also is a method of organizing human activity, *i.e.* learning or teaching.

Courts considering eligibility post-*Alice* have expressly recognized that this type of educational activity is abstract.  For example, *IPLearn LLC* involved a patent directed to "a computer-aided learning method and apparatus" that "assess[es] a user's or a student's understanding in a subject and reward[s] the user who has reached one or more milestones."  76 F. Supp. 3d at 528.  In finding the subject matter abstract, the court observed:

> Instructing students, evaluating those students, and providing methods to review their progress are concepts that have probably existed as long as there has been formal education . . . it is beyond dispute that the claims are directed toward an abstract idea – instruction, evaluation, and review.

*Id.* at 533-34; *see also id.* at 533 ("As a whole, they represent an abstract idea of conventional everyday teaching that happens in schools across the country").  The same is true here.

Like the patent in *IPLearn*, the '025 Patent describes "[a] system and method of training employees via a hosted learning management training system."  Mot., Ex. 1, Abstract.  It provides users with instructional materials including test questions, collects answers to the questions, and sends them to a central server.  *Id.*  The central server allows a manager to review the test results.  *Id.*  This activity is nearly indistinguishable from the claims in *IPLearn* (instruction, evaluation, and review) that was abstract.  76 F. Supp. 3d at 533-34.  Just as in *IPLearn,* the subject matter of the '025 Patent is abstract.

Ignoring the *IPLearn* case entirely, Plaintiff argues that the '025 Patent is not directed to an abstract idea because a "learning management system" is a "specific concrete apparatus" within a "specific, technological field unto themselves." Opp., p. 17.  Yet, Plaintiff does not provide any authority supporting its position that reference to a particular system in the preamble saves the claim from the first part of the *Alice* test.  If that were so, almost all ineligible ideas could be patented using clever drafting techniques such as sprinkling various key words into claim preambles—a practice that *Alice* specifically warns against.  *See Alice,* 134 S.Ct. at 2360 (warning "against interpreting § 101 in ways that make patent eligibility depend simply on the draftsman's art").  In *Alice,* the patent owner argued that its system claims ("computer-based data management system" including "data processing system" with a "communications controller," "data storage unit" "capable of performing basic calculations, storage and transmission functions") were not abstract because it included specific hardware configured to perform specific computerized functions.  134 S.Ct. at 2360.  *Alice's* "computer-based data management system" in the "technological field" of financial services computing is no different than the "specific concrete apparatus" Plaintiff claims here.  The Supreme Court found that the reference to system components added nothing to the underlying abstract idea.  *Id.*  The same is true of the '025 Patent; a "learning management system" adds nothing to the abstract idea of administering tests.

An examination of the '025 Patent claims shows that whatever "specific concrete apparatus" is mentioned in the preamble, the claims still preempt the most fundamental aspects of education instruction and testing.  *See Alice,* 134 S.Ct. at 2354 (reiterating the "concern that patent law not inhibit further discovery by improperly tying up the future uses of these building

blocks of human ingenuity"). For example, below is a markup of independent claim 12, greying the portions that reference generic computing or networking equipment:

> 12. A method of training employees via a hosted learning management training system, each employee having a unique identifier, comprising the steps of:
> a) **presenting a** high bandwidth **training program including a test having questions** on at least one device associated with a local computer having a low bandwidth connection;
> b) **enabling an employee to take the test and enter answers to the questions** on the local computer via a first human-computer interface connected to the local computer;
> c) **providing** a remote computer server at **a central location** in communication with the at least one local computer via the low bandwidth connection and **adapted to receive** low bandwidth **test information** from the at least one local computer;
> d) **transmitting** from the local computer to the central server **only the employee identifier and the** low bandwidth **test information** via the low bandwidth connection **when an employee interacts with the training program; and**
> e) **enabling a manager to access the** low bandwidth **test information** from the central server **in real time.**

As seen above, the entirety of the claim—once the generic computing equipment is removed—can be, and still is in many places, performed by humans. All the greyed-out terms merely recite generic, conventional and well-known computer and networking components. Specifically, step "a" refers to a "high bandwidth training program." This phrase only appears in the claims, but the specification describes it as "a CD-ROM playable on the local computer; a DVD playable on the local computer; a videotape playable in close proximity to the local computer; and at least one software program on the local computer." Mot., Ex. 1, 2:47. These "high bandwidth" examples are conventional, and the '025 Patent expressly admits that CD-ROM and videotape training programs were conventional methods of training. *Id.* at 1:39-41. Thus the conventional and generic "high-bandwidth training program" does not make the claim less abstract.

Step "a" further claims "at least one device associated with a local computer having a low bandwidth connection." The specification provides no further explanation of the local computer,

and refers to it unremarkably as a "local computer, in one of a store, an office, a restaurant, a ticket desk or any other primary customer interface of the company." Mot., Ex. 1, 2:28. From the specification, the local computer must be generic because there is no description of any modifications to the local computer to make it specialized in any way. Because the patent describes using whatever computer is available (*see id.*), the local computer can be any generic computing device. And because the "device associated with a local computer" is "a display or presentation device" (*id.* at 4:40-42), it is generic and conventional as well.

Step "a" also recites a "low bandwidth connection." Like the "high bandwidth," the term low bandwidth is only used in the claims. The specification, however, admits that this low-bandwidth link is **conventional**: "Link 23 can be any type of communication link, but it is preferred that it is a **conventional Internet connection** via a modem, DSL service, a proxy server, or the like." Mot., Ex. 1, 5:43. The Federal Circuit has repeatedly held that "the use of the Internet is not sufficient to save otherwise abstract claims from ineligibility under § 101." *See, e.g., Ultramercial Inc.* 772 F.3d at 716. Thus, it provides no basis for eligibility.

Step "b" adds "a first human-computer interface connected to the local computer." The interface is described as "the mechanism by which an employee enters data into the local computer" such as a conventional keyboard or mouse. Mot., Ex. 1, 4:58. Thus, it too is a generic and conventional computing component, and provides no basis for eligibility.

Step "c" provides additional generic computing equipment: "a remote computer server at a central location in communication with the at least one local computer via the low bandwidth connection and adapted to receive low bandwidth test information from the at least one local computer . . . ." As discussed above, the local computer with a low bandwidth connection is entirely conventional. The '025 Patent admits that "the remote computer server at a central

location" is also conventional when describing prior art training systems: "Certain *conventional* employee training systems place their training programs on *a central computer that is accessible remotely*." Because a remote computer in a central location was conventional at the time of the '025 Patent, it does not provide any basis for patent eligibility.

Step "d" (discussed in more detail below) recites transmitting the test information via the low bandwidth connection to the central server. Because the low bandwidth connection is a "conventional Internet connection," it does not provide any basis for eligibility. Nor does step "e," which merely repeats generic computer terms already discussed above.

Accordingly, the claims provide nothing more than the implementation of an abstract idea—instruction, evaluation, and review—on generic computer equipment configured and operated in a conventional manner. Claims that merely implement an abstract idea on generic computing equipment, like the ones here, are not eligible for patent protection. *Alice* 134 S. Ct. at 2358. Tellingly, desks, test booklets, answer forms, teachers, and filing cabinets could easily replace the conventional computer components recited in the claims. *See IPLearn LLC* 76 F. Supp. 3d at 534. Because the steps could be performed without the generic computing equipment, they are not integral to the claims, and it is merely the implementation of an abstract idea on generic computing hardware. As such, the claims of the '025 Patent are not patentable.

### III. Plaintiff has not shown an "inventive concept" beyond the claimed abstract idea

As detailed in PlayerLync's opening brief, the claims do not contain any inventive concept sufficient to transform the claimed abstract idea into patentable subject matter. In response, Plaintiff argues that the following two features provide sufficient inventive concept to render the claims eligible: (1) "only the employees' low-bandwidth ID and test information are transmitted back to the central server," and (2) "allowing a manager to review employee data as it comes in." Opp., p. 18. Neither of these features provides an "inventive concept."

A.      **"low-bandwidth"**

As already described above, the claims of the '025 Patent introduce the term "low-bandwidth connection" as the link that connects the local computers to the central server, and that low-bandwidth connection is described in the specification as "a *conventional* Internet connection," and "any type of communication link." Mot., Ex.1, 5:38-46. As such, the low-bandwidth connection in the claims is conventional and was well-known long before the filing of the '025 Patent. Indeed, the mere "invocation of the Internet adds no inventive concept" because the Internet "is a ubiquitous information-transmitting medium, not a novel machine." *See, e.g., Ultramercial, Inc.* 772 F.3d 709 at 716-17. Thus, the use of "a conventional Internet connection" does not transform the claims here into eligible subject matter.

Nor does using the Internet to transmit only the data required to review evaluate the test-taker, *i.e.* the employee ID and test information. Rather, sending only what is necessary for the reviewer (the test-taker's name and answers) is common sense, which is why that is the way it has been done for as long as there has been education. A teacher grading test papers does not need to receive the test questions; she only needs each student's name (*i.e.* ID) and the student's answers (*i.e.* test information). Almost all standardized testing performed in public schools for decades use Scantron-style forms that are completed by students by filling in a bubble for each answer. The people or machines grading the tests have no need for the test questions, and thus are only provided the answer form with the students name and the answers—which is exactly what Plaintiff argues is an "inventive concept" here. But sending only the users name and answers is not inventive; it is an age-old idea of administering a test.

B.      **"enables a manager to review the employee data as it comes in"**

Plaintiff next argues that enabling "a manager to review the employee data as it comes in" is an "inventive concept" sufficient to make the abstract idea patent eligible. Opp., p. 18.

But allowing a manager to review the test results is not inventive; rather, it is an entirely routine, conventional and well-understood activity expected of every teacher who uses testing to evaluate learning progress. *See Alice*, 134 S.Ct. at 2359. Indeed, without the ability to review the answers, administering a test is pointless. Teachers using the Scantron-style of administering a test have historically had the ability to review the test information "as it comes in."

Here, the scant references to managerial review of test data in the '025 Patent reveal that it is little more the providing access to data using a computer: "A central server 50 receives test information from local computer 20 . . . A manager, human resources worker, or other supervisory individual can access the data from her computer via the Internet." Mot., Ex 1, 6:21, 3:52 ("A manager may access the test information remotely preferably via a second human-computer interface in communication with the server"). In *Alice*, the Supreme Court explained that accessing data with a computer is "one of the most basic functions of a computer" and is a "well understood, routine, conventional activity previously known to the industry." *Alice,* 134 S.Ct. at 2359. As in *Alice,* the addition of manager access to test results does not transform the abstract idea here into patentable subject matter.

### IV. The Prosecution History Does Not Support Patent Eligibility

Plaintiff's argument that the prosecution history of the '025 Patent somehow supports patent eligibility is wrong. Opp., p. 9-11. As Plaintiff admits, the examiner's § 101 rejection was based on "a now defunct" test. *Id*. at p. 10. Indeed, the Supreme Court has issued two landmark decisions since then—*Alice* and *Mayo*—that significantly heightened the patent eligibility standard under § 101. *See, e.g., Microsostrategy Inc. v. Apttus Corp.*, Case No. 3:15-cv-00021, 2015 WL 4448019 (E.D. VA. July 20, 2015). Thus, examination under the "defunct" standard is irrelevant to patent eligibility now.

Plaintiff also misrepresents the importance of the "low bandwidth" language to the eligibility analysis, claiming that it traversed the examiner's § 101 rejection in March 2007 by arguing that "[c]laim 1 is a machine claim reciting <u>specific</u> computer hardware having <u>specific</u> bandwidth connections . . . ." But none of the claims contained the "low bandwidth" language in March 2007. Rather, the references to a "low bandwidth" were added in August 2007, months *after* the examiner had dropped the § 101 rejection, and instead of supporting eligibility, were added to distinguish the prior art. *See* Opp., Ex. 1, p. 35. Despite Plaintiff's reliance on "low bandwidth" for an inventive concept here, Plaintiff concedes the "low bandwidth" limitation "ha[s] no relevance to the instant [§ 101] inquiry." *See* Opp. p. 11.

## V.  Alleged Evidence of Copying Is Irrelevant to the Eligibility Analysis

Plaintiff also argues, without authority, that evidence that PlayerLync visited Plaintiff's public website is somehow relevant to the patent eligibility inquiry. Opp., p. 11. As an initial matter, none of this "evidence" actually shows that PlayerLync did anything more than review a competitor's public website; it does not show copying. But, more importantly, there is no authority assigning any relevance to so-called "copying" evidence in a § 101 analysis. Although it is occasionally used as objective indicia of non-obviousness under 35 U.S.C. § 103, § 103 is irrelevant to the threshold eligibility analysis, and thus neither is copying. *IPLearn LLC,* 76 F. Supp. 3d at 534 ("A new idea, *i.e.*, one that is non-anticipated and non-obvious, does not however make an abstract idea patent eligible.").

## VI.  Conclusion

The '025 Patent is directed to the abstract idea fundamental to education, the process of instructing, evaluating and reviewing. There is no inventive concept to transform that abstract idea into patent eligible subject matter. Accordingly, '025 Patent is invalid under 35 U.S.C. § 101.

Dated: October 15, 2015

/s/ *Ryan Tyz*
Ryan Tyz, CSB 234895 (Admitted *Pro Hac Vice*)
TYZ MARTON SCHUMANN, LLP
28 2nd Street, Floor 3, #3119
San Francisco, CA 94105
Telephone: (415) 513-0765
Email: ryan@tyzlaw.com

Attorney for Defendant, PlayerLync LLC

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on October 15, 2015.

*/s/ Ryan Tyz*

Ryan Tyz